UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TERRELL WENDRICKS,

                    Plaintiff,

         v.                                   Case No. 20-cv-1189-pp

ANNA SERRES, *et al.*,

                    Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (DKT. NO. 30)**

Plaintiff Terrell Wendricks, who is confined at the Oshkosh Correctional
Institution, filed this case alleging that the defendants violated his
constitutional rights. Dkt. No. 1. The court screened the complaint and allowed
the plaintiff to proceed on claims that the defendants (1) used excessive force in
violation of the Fourth Amendment when trying to take him into custody and
(2) responded inadequately to his medical needs, in violation of the Fourteenth
Amendment. Dkt. No. 8 at 5-6. The defendants have filed a motion for
summary judgment. The court will grant the motion as to the plaintiff's
Fourteenth Amendment medical care claim and the deny the motion as to his
Fourth Amendment excessive force claim.

I.    **Facts**

      A.    <u>August 2, 2018: Officer Respond to a Disturbance</u>

      On August 2, 2018, at approximately 5:16 a.m., the defendants—City of
Green Bay Police Officers Lucy Elfman, Anna Serres, Aaron Walker, Alexander

1

Carlson and Rodney Reetz—were dispatched in response to a disturbance complaint in apartment 3 of the complex located at 2709 Humboldt Road in Green Bay, Wisconsin. Dkt. No. 46 at ¶¶2-6, 9. Prior to their arrival, dispatch informed the officers that the complainant was the next-door neighbor, who said that she could hear "a verbal argument, physical disturbance and a female screaming, 'Don't kill me!'" Id. at ¶10. Dispatch informed the officers that the complainant had said that her boyfriend (later identified as Andrew Christopherson) had broken into the apartment where the screaming was coming from and that Christopherson and a male in the apartment (later identified as the plaintiff), were yelling and fighting. Id. at ¶11. While Christopherson and the plaintiff were fighting, the female victim from the apartment had run across the hall and into the complainant's apartment. Id. Dispatch told the officers that the complainant had said that one of the males was bleeding but did not know if rescue was needed. Id. at ¶12.

At about 5:20 a.m., Serres, Elfman, Walker and Carlson arrived on the scene and saw Christopherson outside the apartment building holding a Samurai sword and yelling, "He's up there," as he pointed to the upstairs area of the complex. Id. at ¶13. Walker ordered Christopherson to drop the sword. Id. at ¶14. Christopherson dropped the sword and officers temporarily detained him "to further the investigation of the disturbance." Id.

Carlson and Serres entered the apartment complex; Elfman and Walker took possession of the sword and interviewed Christopherson. Id. at ¶15. In the apartment complex, Carlson and Serres saw blood smeared on the walls,

carpet, stairs, the front door of apartment 4 and the door to apartment 3, which was propped open and ajar. Id. at ¶17. Carlson and Serres went into apartment 3 and announced their presence as police. Id. at ¶18; Dkt. No. 47 at ¶ 7. The plaintiff was inside apartment 3, lying on a futon cushion in the living room. Dkt. No. 46 at ¶19. The plaintiff was nude from the waist down and there was a large amount of blood on his left arm and smeared on the rest of his body. Id. Serres stayed with the plaintiff while Carlson conducted a safety sweep of the apartment. Id. at ¶20. While conducting the safety sweep, Carlson saw blood "all over," smelled a strong odor of burnt marijuana and saw several items of drug paraphernalia. Id. After conducting the safety sweep, Carlson announced that the apartment was clear and Walker and Elfman came in. Id. at ¶21.

The officers observed that the plaintiff "appeared to be under the influence of narcotics and disassociated with reality." Id. at ¶22. They also noted the plaintiff's "large size," which they estimated at 280 pounds. Id. at ¶23. According to the defendants, though Carlson saw blood all over the inside of the apartment and on the plaintiff, the plaintiff did not appear to be in immediate need of medical assistance and did not make any statements that he needed medical assistance. Id. at ¶24. The plaintiff was conscious, and he was talking erratically about random things. Id. at ¶25. Serres asked the plaintiff where he was injured; the plaintiff responded "his penis," but Serres did not see any blood in that area. Id. at §26. The defendants state that the plaintiff told Elfman that the plaintiff was bleeding from his penis, but Elfman

3

could not observe any visible wound on the plaintiff's genitalia and did not see any other visible injury.[1] Id. at ¶27. The defendants recount various "bizarre" comments the plaintiff made to Serres and Elfman, behavior that led Elfman to believe the plaintiff was either mentally ill or under the influence of drugs; the plaintiff does not recall making the statements. Id. at ¶28.

The plaintiff's behavior was "up and down" during the short time officers were with him in the apartment. Id. at ¶30. At times, he would cease all movement and stare at officers, and then he would make exaggerated movements. Id. Based on her training and experience, Elfman knows that these are considered "Early Warning Signs" by the Wisconsin Defense and Arrest Tactics (DAAT) manual, which officers are trained to associate with a high level of danger to officers. Id. Carlson's threat assessment heightened because of the plaintiff's size, unusual behavior and the fact that he appeared to be under the influence of an unknown narcotic. Id. at ¶31.

The parties' versions of what happened next differ. Generally, the defendants state that the plaintiff threatened and actively resisted their attempts to take him into custody, and that they used reasonable force to take him into custody. The plaintiff does not dispute that the defendants used force, but he denies that he threatened or actively resisted the defendants.

According to the defendants, Serres tried to ask the plaintiff what happened and the plaintiff rolled onto his knees saying, "Come here," in a calm

---

[1] The plaintiff disputes this fact and avers that he never complained of injured genitalia. Dkt. No. 43.

voice as he stood up from the mattress, approached Serres in an aggressive manner and attempted to grab her. Id. at ¶32. The defendants state that the threat of active resistance prompted Serres and Elfman to draw their Electronic Control Devices (Tasers), point them at the plaintiff and direct him down to the ground. Id. at ¶34. The plaintiff sat back down on the bed. Id. The defendants state that at this point, officers decided that the plaintiff needed to be secured with handcuffs because of his exaggerated movements, aggressive and erratic behavior, excessive emotional attention and attempt to grab Serres.[2] Id. at ¶35.

Carlson and Walker approached the plaintiff to attempt to detain him by rolling him over onto his stomach. Id. at ¶36. According to the defendants, when Carlson and Walker tried to secure the plaintiff in handcuffs, "a violent struggle ensued."[3] Id. at ¶37. The defendants assert that Carlson "moved [the plaintiff] onto his stomach and was able to place his left hand into the handcuff, however due to [the plaintiff's] continued resistance, was unable to get [his] right arm secured." Id. at ¶ 39. The defendants state that Carlson could feel the muscles in the plaintiff's bicep and forearm areas tense up as he attempted to pull his left arm away from the officers' grasp. Id. The defendants say that Walker attempted to turn the plaintiff over and the plaintiff started yelling, "I fucked my brother in the ass," and tensed the muscles in his arms. Id. at ¶40. Walker tried to gain control of the plaintiff's right arm, but the

---

[2] The plaintiff states that he "never tried to grab or disarm Officer Serres." Dkt. No. 43.

[3] According to the plaintiff, he "did not use violence against the officers." Dkt. No. 43.

plaintiff pulled away, stopped moving, went limp for a few seconds and then began rolling towards the door. Id. The defendants state that Carlson ordered the plaintiff to "stop resisting" and to put his arms behind his back and when the plaintiff continued to resist, Carlson and Walker disengaged from the plaintiff and re-positioned themselves to create enough space to effectively deploy their Tasers.[4] Id. at ¶41.

According to the defendants, Carlson stated, "Taser," and Serres deployed her Taser probes into the plaintiff's buttocks, but the Taser appeared to have no effect on the plaintiff as he began to thrash more. Id. at ¶42. The defendants state that Carlson drew his Taser to gain compliance from the plaintiff, who was growing increasingly combative. Id. at ¶43. Carlson deployed his Taser, but the deployment had no effect and while the plaintiff was being actively Tased, he opened his eyes wide, began to smile and exclaimed loudly, "That little pain don't affect me!" Id. The defendants state that because the plaintiff appeared unaffected by the previous Taser deployments, Elfman deployed one cycle from her Taser to the plaintiff's stomach and upper thigh, but the plaintiff again appeared unaffected. Id. at ¶44.

According to the defendants, Carlson then deployed a second set of Taser probes into the right side of the plaintiff's back, which brought the plaintiff to the ground near the doorway. Id. at ¶45. The defendants state that Carlson

---

[4] The plaintiff asserts that he was not "actively resisting" and that "tensing the body is not enough to justify tasing" [] and "pulling your arm away is at most passive minimal resistance and not enough to justify the amount of tasers used." Dkt. No. 46 at ¶41.

again directed the plaintiff to the ground, but that the plaintiff continued to fight with officers. Id. at ¶46. The defendants state that the plaintiff exhibited "pre-attack postures," had a "thousand-yard stare" as he clenched his fists and did not respond to commands.[5] Id. at ¶48. The defendants state that to stop the plaintiff's continued active resistance and because the Taser deployments were not effective, Carlson "delivered multiple strong sidekicks with his right leg to [the plaintiff's] thigh, hip area and abdomen," but that the sidekicks appeared to have no effect on the plaintiff.[6] Id. at ¶49.

According to the defendants, the plaintiff's agitation and aggressiveness continued to increase, and he charged toward Walker. Id. at ¶50. The defendants state that Serres and Elfman deployed their Tasers because it appeared to them that the plaintiff was going to attempt to attack them. Id. at ¶51. The defendants say that the plaintiff stumbled backward, and officers took him to the ground. Id. They state that Walker got on top of the plaintiff and tried to secure his arms, but that the plaintiff continued to violently fight while on the ground.[7] Id. at ¶52. The defendants state that during the struggle, Walker was pushed out into the stairway and "leveled a knee strike into [the plaintiff's] left side as he lay on the floor." Id. at ¶53. The defendants say that

---

[5] The plaintiff disputes this and states that laying on the ground limp is not a pre-attack posture. The plaintiff states that he never punched, kicked, bit, spit or attacked the officers in any way. Dkt. No. 46 at ¶48.

[6] The plaintiff states that he was not actively resisting. Dkt. No. 46 at ¶ 49.

[7] The plaintiff avers that he did not use violence against the officers. Dkt. No. 43.

this had no impact and that the plaintiff appeared to grow stronger as the fight continued. Id. They state that Walker drew his baton and "stuck [the plaintiff] once in his leg," but that the plaintiff continued to actively resist.[8] Id. at ¶54. Walker used his baton to pry the plaintiff's right arm from underneath his body, applying a defensive tactic known as a "C-lock." Id. at ¶55. The defendants state that Serres kneeled on the plaintiff's shoulders and upper back using her body weight to keep him from attempting to stand up, but the plaintiff continued to resist and push against Serres' shins. Id. at ¶56. Elfman yelled, "Stop resisting," as she "utilized baton strikes on [the plaintiff's] lower body." Id. at ¶57. The defendants state that the plaintiff continued to resist and that officer exhaustion became a factor. Id. at ¶60. The defendants state that Carlson delivered a "drive-stun" to the plaintiff's left leg and buttocks area, which seemed to have "somewhat of an effect." Id. at ¶62. The defendants say that the plaintiff remained uncooperative, and that he physically and actively resisted officers' attempts to place him into custody. Id.

Carlson requested additional units to respond quickly. Id. at ¶63. At 5:25 a.m., Officer Reetz arrived on scene. Id. at ¶64. According to the defendants, Reetz observed that the plaintiff was violently resisting and fighting with officers.[9] Id. at ¶65. They state that the plaintiff refused to follow officers'

---

[8] The plaintiff disputes this fact and states that he "was not actively resisting." Dkt. No. 46 at ¶54. The plaintiff states, "At most I offered passive minimal resistance in response to officers beating and electrocuting me." Id.

[9] The plaintiff disputes this fact and states that he was not violently resisting or fighting officers. Dkt. No. 46 at ¶65.

directions and Reetz drew his OC spray and delivered a one- to one-and-a-half-second spray onto the left side of the plaintiff's face. Id. at ¶66. The defendants state that officers were finally able to gain control of the plaintiff's arms and placed him into custody using three sets of handcuffs.[10] Id. at ¶67. Rescue was called for the plaintiff and was enroute to the apartment complex by 5:28 a.m. Id. at ¶68. The defendants state that after being placed in handcuffs, the plaintiff refused to walk and that officers were forced to carry him downstairs, where Green Bay Metro Fire Department Rescue evaluated him. Id. at ¶69.

As stated above, the plaintiff disputes that he used force or violence against the defendants. Dkt. No. 43. The plaintiff avers:

> I never tried to get officers to lay with me on the futon. I never tried to grab or disarm Officer Serres. I did not use violence against the officers involved. I did not inflict any injuries to the officers involved. I crawled on my knees towards the door officers were standing in front of. When commanded to get back I did. I allowed myself to be turned to my stomach. The force the officers used had extremely painful effects. I never attacked officers. I never pushed, punched, kicked, spat, bit or used any force against officers. I believed officers were trying to kill me. I believed I was dying.

Dkt. No. 43.

B.    At the Medical Center

"Rescue" transported the plaintiff to Aurora Bay Care Medical Center; he arrived at the emergency room at 6:07 a.m. Dkt. No. 46 at ¶71. While there, Walker observed the plaintiff as he continued to exhibit various highs and lows while coming down from the drug acid, which the plaintiff admitted to using.

---

[10] The plaintiff states that officers "hogtied" him and continued to use force on him after he was restrained. Dkt. No. 46 at ¶67. The plaintiff has not cited admissible evidence to support these assertions.

9

Id. at ¶72. The plaintiff rambled on about songs, the victim and killing demons. Id. The defendants say that the medical records show that the plaintiff arrived at the Medical Center in an "altered state" accompanied by multiple police officers and was "screaming and flailing about," which prevented medical staff from reviewing his symptoms. Id. at ¶74. According to the defendants, the records said that the plaintiff was "bleeding from left wrist laceration, but patient [was] too much of a behavior risk to safely get near . . . ." Id. at ¶75. The defendants indicate that the records showed that the plaintiff "had a laceration to his left wrist [...] but was 'without any other identifiable injuries'" and that he was able to "move all his extremities without difficulty." Id. at ¶76. Medical professionals cleared the plaintiff and noted that "[t]here does not appear to be an acute medical emergency ongoing that would require hospitalization and prevent this patient from being medically cleared." Id. at ¶77.

C.    Plaintiff's Alleged Injuries

Green Bay police officers are not trained medical professionals. Id. at ¶78. They are trained as first responders and can attempt to determine if an individual is suffering from a life-threatening injury, such as loss of consciousness or not breathing. Id.

According to the defendants, Carlson believed that the plaintiff had a superficial injury and did not believe that the plaintiff was suffering from a life-threatening injury that would have required immediate medical attention. Id. at ¶79. The defendants say that the plaintiff never verbalized that he was injured

during his contact with Walker. Id. at ¶80. They maintain that the plaintiff never told Reetz that he was injured or hurt at any time during their encounter. Id. at ¶81. It did not appear to Elfman that the plaintiff was suffering from any life-threatening injury that would have required immediate medical attention. Id. at ¶82. Serres did not observe any life-threatening injuries on the plaintiff. Id. at ¶83.

Before officers can conduct any evaluation or assessment of an injury, officer safety first must be established. Id. at ¶84. Aside from obvious injuries, an officer's first observations are for dangerous behaviors and situations that need to be neutralized. Id. According to the defendants, officers could not safely observe the plaintiff until after he was taken into custody. Id. at ¶85. By that time, rescue had arrived and was prepared to assess any potential medical needs. Id.

After being medically cleared, the plaintiff was transported to the Brown County Jail. Dkt. Id. at ¶86. On November 9, 2020, the plaintiff pled no contest[11] to the following charges stemming from his August 2, 2018 arrest:

- Wis. Stat. §941.30(2), Second-Degree Recklessly Endangering Safety;
- Wis. Stat. §940.30, False Imprisonment;
- Wis. Stat. §940.235(1), Strangulation and Suffocation;
- Wis. Stat. §946.41(1), Resisting or Obstructing an Officer;

---

[11] The defendants stated that the plaintiff pled "guilty" to these charges. Dkt. No. 46 at ¶87. The plaintiff disputes this, indicating that the "CCAP" the defendants filed with their motion shows that he did not plead guilty. Dkt. No. 44 at ¶87. The defendants attached to the declaration of defense attorney Jasmyne Baynard a printout from the Wisconsin Circuit Court Access Program for State v. Brown, Case No. 2018CF001108; the first page of that printout indicates that the charges were disposed of by "Guilty Due to No Contest Plea." Dkt. No. 38-2 at 1.

- Wis. Stat. §940.225(3m), 4th Degree Sexual Assault; and
- Wis. Stat. §940.19(1), Battery.

Id. at ¶87.

**II.    Analysis**

A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be

12

admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

    B.   <u>Excessive Force Claim</u>

The defendants contend that they did not violate the plaintiff's Fourth Amendment rights because they did not use excessive or unreasonable force to take him into custody. Dkt. No. 31 at 5-6. According to the defendants, they reasonably used a continuum of force which included verbal commands, Taser deployments, knee strikes, baton and OC spray to arrest the plaintiff, who posed a threat to the officers and actively resisted their attempts to take him into custody. <u>Id.</u> at 7-9. The defendants also contend that they are entitled to qualified immunity. <u>Id.</u> at 17-18. Finally, the defendants contend that the plaintiff's Fourth Amendment claims may be barred by <u>Heck v. Humphrey</u>, 512 U.S. 477, 487 (1994). Dkt. No. 31 at 19; Dkt. No. 48 at 15.

The plaintiff argues that the defendants used excessive force and that their conduct was egregious, unreasonable and malicious. Dkt. No. 41 at 2-4. According to the plaintiff, the defendants attacked him, and he did not threaten them. The plaintiff also states that the defendants continued to use unnecessary force on him after he was handcuffed.[12] <u>Id.</u> at 4.

---

[12] As noted above, the plaintiff states that he was "hog-tied" and that the defendants used Tasers on him after he was restrained. Dkt. No. 41 at 4. The plaintiff has not submitted admissible evidence supporting his assertions that the defendants hog-tied him or that they used excessive force on him after they restrained him.

### 1. *Discovery Issue*

The defendants contend that the plaintiff admitted he resisted officers'
attempts to take him into custody because he did not respond to the
defendants' March 3, 2021 Request for Admissions until April 19, 2021. Dkt.
No. 46 at ¶88; Dkt. No. 31 at 3-4; Dkt. No. 48 at 2. But the court's January 3,
2021 scheduling order extended the parties' time to respond to discovery
requests from thirty days to sixty days. Dkt. No. 23 at 1, §1. The plaintiff
served his response to the defendants' March 3, 2021 request for admissions
on April 19, 2021, well within the sixty-day time limit. See Fed. R. Civ. P.
36(a)(3). The court will not deem all the defendants' requests for admissions
admitted nor hold that the plaintiff admitted that he resisted officers' attempts
to take him into custody.

### 2. *Merits*

The court analyzes an arrestee's claim for excessive force under the
Fourth Amendment's objective reasonableness standard. <u>Graham v. Connor</u>,
490 U.S. 386, 388 (1989). "An officer's use of force is unreasonable if, judging
from the totality of the circumstances at the time of the arrest, the officer uses
greater force than was reasonably necessary to effectuate the arrest." <u>Gupta v.
Melloh</u>, 19 F.4th 990, 996 (7th Cir. 2021) (quoting <u>Phillips v. Cmty. Ins. Corp.</u>,
678 F.3d 513, 519 (7th Cir. 2012)).

> A court must evaluate whether the officer's actions were objectively
> reasonable in light of the facts and circumstances confronting that
> officer. *Graham*, 490 U.S. at 396 . . . (1989). "The test of
> reasonableness under the Fourth Amendment is not capable of
> precise definition or mechanical application." *Id.* "[I]ts proper
> application requires careful attention to the facts and circumstances

of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* And because of this fact-intensive nature of the inquiry, [the Seventh Circuit has] noted that "since the *Graham* reasonableness inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefore, we have held on many occasions that summary judgment or judgment as a matter o flaw in excessive force cases should be granted sparingly." *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (internal quotations and citations omitted). In other words, we cannot determine whether [and officer] used greater force than was reasonably necessary during an arrest until a fact finder resolves how much force he used and what level of force he needed to use to effectuate the arrest.

Id.

The Supreme Court has held that the officer's right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," and that the question is whether the force used was reasonable. Graham, 490 U.S. at 396. The Seventh Circuit has found that in some circumstances, the use of a Taser to control a suspect who is actively resisting is not unreasonable. See Clarett v. Roberts, 657 F.3d 664, 674-75 (7th Cir. 2011) (affirming defense verdict where defendant used Taser three times on plaintiff due to her kicking and flailing and continuing assaultive behavior as defendant was arresting her); United States v. Norris, 640 F.3d 295, 303 (7th Cir. 2011) (use of Taser on defendant was reasonable where defendant had "displayed an unwillingness to accede to reasonable police commands, and his actions suggested an intent to use violence to fend off further police action"); Forrest v. Prine, 620 F.3d 739, 745-46 (7th Cir. 2010) (affirming summary judgment for officer on plaintiff's excessive force claim,

where plaintiff was a large man in a confined area who was intoxicated, defiant, belligerent, was clenching his fists and yelling obscenities and had attacked another officer earlier that evening). The court has found that officers' use of batons, knee strikes and OC spray was reasonable given the level of force used and the level of the plaintiff's continued resistance. See Padula v. Leimbach, 656 F.3d 595, 603 (7th Cir. 2011). These cases, however, involved a fact-intensive analysis of the particular force used and the particular circumstances during which the officers used it.

According to the defendants, the plaintiff posed a threat to them and actively resisted their attempts to take him into custody. Dkt. No. 31 at 8. The defendants state that they used reasonable force to take the plaintiff into custody, including verbal commands, taser deployments, knee strikes, baton and OC spray. Id. at 7-8. The plaintiff denies that he posed any threat to the defendants. Dkt. No. 41 at 2-4. The plaintiff stated in his response to the summary judgment motion:

> The totality of the force that the officers used against me is baffling. Officer Walker delivered knee strikes while I was prone, jumped on me, delivered baton strikes and put my right arm into a c-lock. Officer Elfman tased me for 297 seconds and delivered at least 7 baton strikes. Carlson tased me for 361 seconds and says he repeatedly kicked me as hard as he could while I am on the ground. Serres tased me for 396 seconds, at one point kneeling on my back while delivering taser bolts.[13] Reetz pepper sprayed me and puts me in an armbar. The police arrived at 5:20 and didn't use force until

---

[13] While it is undisputed that Elman, Carlson and Serres used their Tasers on the plaintiff multiple times, the record does not support the plaintiff's assertions regarding the length of time they used the Tasers against him. The documents the plaintiff submitted regarding Taser deployments are not authenticated and, even if they were, do not state what the plaintiff says they do. See Dkt. No. 41-1 at 33-52, Exs. M, N, O.

> sometime between 5:26 and 5:27. Meaning that for at least 6
> minutes the officers didn't perceive me as a threat or risk.

Dkt. No. 41 at 4.

The plaintiff did not sign his response to the motion for summary judgment. But his verified complaint describes the force the officers used on him and implies that they used that force solely due to prejudice. Dkt. No. 1 at 8. As the court has discussed above, he provided specific responses to each of the defendants' proposed findings of fact. In support of his opposition to the summary judgment motion, the plaintiff filed a declaration under penalty of perjury, stating that he never used any kind of violence against the officers and disputing actions the officers claim he took. Dkt. No. 43.

The defendants argue that this declaration "is merely a litany of conclusory statements and speculation wholly insufficient to create a genuine dispute of material fact regarding any of his constitutional claims." Dkt. No. 48 at 3. They assert that the plaintiff cannot dispute that the scene the officers found in the apartment was "chaotic." Id. at 4. They find incredible the plaintiff's assertions that he doesn't remember making certain statements to the officers, but that he does remember that he did not use violence or pose a threat. Id. at 5.

The defendants do not use the words "self-serving" in describing the plaintiff's declaration, but that is what they imply. The Seventh Circuit has held multiple times that a party's affidavit—even an allegedly "self-serving" one—can constitute evidence sufficient to defeat a summary judgment motion. In Payne v. Pauley, the court discussed a plaintiff's affidavit, then stated:

> We hope this discussion lays to rest the misconception that evidence presented in a "self-serving" affidavit is never sufficient to thwart a summary judgment motion. Provided that the evidence meets the usual requirements for evidence presented on summary judgment—including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there is a genuine issue for trial—a self-serving affidavit is an acceptable method of a non-moving party to present evidence of disputed material facts.

Payne v. Pauley, 337 F.3d 767, 773 (7th Cir. 2003). See also, e.g., Hill v. Tangherlini, 724 F.3d 965, 967-68 & n.1 (7th Cir. 2013) (the term "self-serving" must not be used to reject admissible evidence through which a party tries to present his side of the story at summary judgment).

The defendants argue that the plaintiff's version of events is not credible. But at the summary judgment stage, this court cannot "weigh credibility, balance the relative weight of conflicting evidence, choose between competing inferences, or resolve swearing contests." Flowers v. Renfro, No. 21-2675, 2022 WL 3569595, at *3 (7th Cir. Aug. 19, 2022). The defendants have attested to what they say happened in the apartment that morning. The plaintiff has attested to what he says happened in the apartment that morning. At summary judgment, it is not the court's role to decide which of those versions of events is more credible.

There is a dispute as to an issue of material fact regarding what force the defendants used against the plaintiff and whether that force was objectively reasonable given all the facts and circumstances. Police officers cannot use significant force on suspects who are not resisting or who are only passively resisting. Abbott v. Sangamon Cty., Ill., 705 F.3d 706, 732 (7th Cir. 2013). If a jury were to believe the plaintiff's version of the events—namely, that the

18

defendants, kicked him, used their tasers, a baton and OC spray on him and that the plaintiff did not threaten or actively resist the defendants—it could reasonably find that the defendants' use of force against the plaintiff was excessive.

The defendants argue that they are entitled to qualified immunity. An official is entitled to qualified immunity if a plaintiff fails to show that a violation of a constitutional right occurred or fails to show that the right was clearly established at the time of the alleged violation. Williams v. City of Chi., 733 F.3d 749, 758 (7th Cir. 2013) (citing Pearson v. Callahan, 555 U.S. 223, 231 (2009)).

The law has been clear for many years that an officer cannot use substantial force against an individual who is not actively resisting. See Abbott, 705 F.3d at 732 (holding that it was clearly established before 2007 "that police officers could not use significant force on a nonresisting or passively resisting suspect" and that "police officers cannot continue to use force once a suspect is subdued"). The defendants were on notice that using force against an unresisting, or passively resisting, individual violated the Constitution. If a jury were to accept the plaintiff's version of events, it would mandate the conclusion that the defendants' actions violated a clearly established constitutional right. Because the plaintiff has raised questions of fact as to whether the defendants used reasonable force against him, the defendants are not entitled to qualified immunity.

19

3.    _Heck v. Humphrey_

The defendants contend that the plaintiff's Fourth Amendment claim may be barred by Heck v. Humphrey, 512 U.S. 477 (1994), because it is inconsistent with his criminal conviction for violating Wis. Stat. §946.41(1), Resisting or Obstructing an Officer. Dkt. No. 31 at 19; Dkt. No. 48 at 15. The plaintiff responds that he should be able to maintain his claim for excessive force despite his no contest plea because the degree of force used is not an element of resisting or obstructing an officer. Dkt. No. 41 at 7.

Heck precludes a §1983 claim when "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence," unless he proves that his "conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. 477, 486-87 (1994). It is undisputed that the plaintiff pled no contest[14] to several charges, including Resisting or Obstructing an Officer in violation of Wis. Stat. §946.41(1), which provides that "whoever knowingly resists or obstructs an officer while such officer is doing any act in an official capacity and with lawful authority is guilty of a Class A misdemeanor."

---

[14] The plaintiff's "no contest" plea resulted in a conviction, to which Heck applies. See Green v. Chvala, 567 F. App'x 458, 459-60 (7th Cir. 2014) (citing Ballard v. Burton, 444 F.3d 391, 396-97 (5th Cir. 2006)).

The Seventh Circuit has held that a plaintiff can proceed on an excessive force claim under §1983 to the extent that the facts underlying the claim are not inconsistent with the essential facts supporting the conviction for resisting arrest. See Helman v. Duhaime, 742 F.3d 760, 762 (7th Cir. 2014); see also Evans v. Poskon, 603 F.3d 362, 364 (7th Cir. 2010). A plaintiff found guilty of resisting arrest could not maintain a §1983 action premised on the claim that he did not resist being taken into custody, but he could proceed on claims that the police used excessive force in effecting custody or after doing so. Evans v. Poskon, 603 F.3d at 364; see also VanGilder v. Baker, 435 F.3d 689, 692 (7th Cir. 2006) ("Were we to uphold the application of Heck in this case, it would imply that once a person resists law enforcement, he has invited the police to inflict any reaction or retribution they choose, while forfeiting the right to sue for damages.").

In Evans, which "illustrates how a fourth-amendment claim can coexist with a valid conviction," an incarcerated person who had been convicted of attempted murder and resisting arrest filed a civil rights case alleging that officers used excessive force during and after his arrest. 603 F.3d at 363-64. The parties disputed whether the officers used excessive force. Id. ("According to the officers, Evans resisted arrest and had to be subdued; according to Evans, he offered no resistance and was beaten mercilessly both before and after the officers gained custody of him."). The plaintiff in Evans contended: "(1) that he did not resist being taken into custody; (2) that the police used excessive force to effect custody; and (3) that the police beat him severely even

21

after reducing him to custody." Id. The Seventh Circuit explained that it did not understand the plaintiff "to assert that he is advancing propositions (2) and (3) if and only if the district court accepts proposition (1)." Id. Rather, the plaintiff's briefs informed the court that he was willing to proceed on proposition (3) alone." Id. The Seventh Circuit held that on remand, the district court should simply disregard proposition (1), which was incompatible with the plaintiff's conviction, and permit the plaintiff to proceed on propositions (2) and (3), which were "entirely consistent with a conviction for resisting arrest." Id. (citing Gilbert v. Cook, 512 F.3d 899 (7th Cir. 2008)).

The Evans court distinguished Okoro v. Callaghan, 324 F.3d 488 (7th Cir. 2003), which the defendants cite in support of their argument that Heck may bar the plaintiff's excessive force claim. In Okoro, the plaintiff was convicted of drug violations and later brought a civil rights case against officers seeking return of gems and cash he claimed the officers had seized while searching his home. 324 F.3d at 489. The court of appeals noted that it was theoretically possible for the plaintiff to have been guilty of the drug violations yet also have been the victim of a theft by the arresting officers. Id. But the plaintiff "adhered steadfastly to his position that there were no drugs, that he was framed" and therefore made an impermissible collateral attack on his drug conviction. Id. at 490. The court concluded that Heck barred his claim because, by denying that there were any drugs and arguing that he was framed, he was challenging the validity of the guilty verdict. Id.; see also Tolliver v. City of Chi., 820 F.3d 237, 243-44 (7th Cir. 2016) (Heck bars a suit

22

where the "factual claims in the civil suit necessarily imply the invalidity of the criminal conviction").

Here, the plaintiff does not adhere to a position incompatible with his conviction for resisting or obstructing arrest. The plaintiff's complaint makes no mention of resisting or not resisting. It focuses only on the defendants' alleged use of excessive force. Nor does the plaintiff's summary judgment declaration explicitly state that he did not resist arrest. Dkt. No. 43. Rather, the plaintiff denies that he used force or violence on the defendants. Id. In response to the defendants' proposed findings of fact, the plaintiff states that he was not "actively resisting" and that "pulling your arm away is at most passive minimal resistance," at most he offered "passive minimal resistance in response to officers beating and electrocuting" and that he was not violently resisting or fighting officers. Dkt. No. 46 at ¶¶41, 49, 54, 65. Because the plaintiff acknowledges that he passively resisted arrest, the plaintiff's insistence that he did not actively resist arrest in the manner the defendants describe is not incompatible with his conviction for resisting arrest. See Hardrick v. City of Bolingbrook, 522 F.3d 758, 764 (7th Cir. 2008) ("The fact that Hardick 'struggled while being handcuffed' at one point in time does not preclude the possibility that at another point in time, Hardrick was 'peaceably waiting to be handcuffed.' Whether a fact-finder would find this scenario plausible is not for us to conclude, but in terms of Heck, it is not one that necessarily implies the validity of the conviction, and does not bar Hardrick's excessive force claim.")

(internal quotation marks omitted). <u>Heck</u> does not preclude the plaintiff from proceeding on his excessive force claim.

The plaintiff is entitled to an opportunity to prove his excessive force claim. He may not, however, argue or seek to prove that he did not resist arrest at all. <u>See</u> <u>Evans</u>, 603 F.3d at 364.

C.    <u>Medical Care Claim</u>

The defendants contend that they did not violate the plaintiff's Fourteenth Amendment rights because the plaintiff has not presented evidence that would establish that he was suffering from injuries or that any of the officers violated his constitutional rights by not providing him medical attention. Dkt. No. 31 at 10. They state that the plaintiff has not demonstrated that he suffered from an objectively serious medical condition and that the defendants were not knowingly inattentive to the plaintiff's alleged injury. <u>Id.</u> at 11-14. The defendants also contend that the court should dismiss this claim because there is no evidence that the defendants acted in an objectively unreasonable manner. <u>Id.</u> at 15.

The plaintiff responds that the defendants violated his Fourteenth Amendment rights. Dkt. No. 41 at 4. According to the plaintiff, the officers knew he was bleeding based on the information received from dispatch. <u>Id.</u> at 4-5. He states that they had six minutes to assess his injuries, call for rescue or provide first aid, but that they did not take any of those actions. <u>Id.</u> at 5. The plaintiff states that even without his substantial blood loss he was considered a medical emergency because he was suffering from an altered consciousness of

24

excited delirium. Id. The plaintiff acknowledges that the officers called for rescue, but says they made rescue wait down the road until they were told to come. Id.

A §1983 claim that a state pretrial detainee has received inadequate medical care is predicated on the rights secured by the Fourteenth Amendment's Due Process Clause. James v. Hale, 959 F.3d 307, 318 (7th Cir. 2020) (citing Miranda v. Cty. of Lake, 900 F.3d 335, 346-47 (7th Cir. 2018)). Claims of inadequate medical care while in pretrial detention are subject to an objective reasonableness standard. Id. (citing Miranda, 900 F.3d at 352). The plaintiff bears the burden to demonstrate objective unreasonableness, and he must make a two-part showing. Id. First, he must show that the defendants acted purposefully, knowingly or recklessly when considering the consequences of their response to the medical condition at issue in the case. Id. (citing McCann v. Ogle Cty., Ill., 909 F.3d 881, 886 (7th Cir. 2018)). Second, the plaintiff must show that the challenged conduct was objectively unreasonable given the totality of the relevant facts and circumstances. Id.

It is undisputed that Carlson and Serres entered the apartment complex and observed blood smeared on the walls, carpet, stairs and front doors of apartments 3 and 4. They encountered the plaintiff in apartment 3, lying on a futon cushion in the living room. The plaintiff was nude from the waist down and there was a large amount of blood on his left arm and smeared on the rest of his body. Carlson conducted a safety sweep of the apartment and saw blood all over the apartment. Walker and Elfman entered the apartment. The officers

perceived that the plaintiff appeared to be under the influence of narcotics and dissociated with reality. Despite the blood on the plaintiff and in the apartment, the plaintiff did not appear to be in immediate need of medical assistance and did not make any statements that he needed medical assistance. The plaintiff was conscious and talking, and his behavior was "up and down." After the plaintiff approached Serres, the officers decided the secure the plaintiff.[15] By the time the defendants had secured the plaintiff and removed him from the apartment, medical personnel had arrived, and the medical personnel transported the plaintiff to the hospital. Hospital staff confirmed that the plaintiff had a laceration to his left wrist but had no other identifiable injuries. Medical professionals cleared the plaintiff and he was transported to the Brown County Jail.

The defendants, who are Green Bay police officers, are not trained medical professionals. They receive training as first responders, which means that they can attempt to determine if an individual is suffering from a life-threatening injury, such as loss of consciousness or not breathing. The defendants determined that the plaintiff was not suffering from a life-threatening injury. They secured him and let the medical professionals take over when they arrived. A reasonable jury could not conclude that the defendants acted unreasonably. See Ferguson v. Cook Cty. Corr. Facility/Cermak, 835 F. App'x 438, 441 (7th Cir. 2020) (arresting officer did

_____

[15] As discussed in the preceding section, the parties dispute the facts surrounding the plaintiff's arrest.

not act unreasonably by taking arrestee to police station instead of seeking immediate treatment for mental health needs because arrestee did not present immediate danger to himself or others and because, after observing arrestee, officer attended to his condition by transferring him to a facility where his needs could be further addressed).

Much of the plaintiff's argument is based on the fact that the dispatcher recounted to the officers that the complainant had related that one of the men was bleeding and that when the officers arrived, they saw blood all over the place. He asserts that the amount of blood the officers observed should have alerted them that he had to have had more than a superficial injury and argues that the fact that officers asked him where he was bleeding proved that they knew he was injured. There is no dispute that there was blood—apparently a good deal of it. But when the officers asked the plaintiff where he was bleeding, he answered that it was his penis, despite officers seeing no blood in that area. (The court understands that the plaintiff disputes that he gave this answer.). Even viewing the facts in the light most favorable to the plaintiff, there is no evidence that the plaintiff had suffered a life-threatening injury. The plaintiff has not alleged that he was unconscious. He has not alleged that he could not breathe. He has not disputed that he was awake and talking while the officers were present. He has not alleged that he lost so much blood that he passed out. He has not even described the injury he alleges he suffered, referring only to the hospital reports (which described a laceration).

The court will grant the defendants' motion for summary judgment as to the plaintiff's Fourteenth Amendment claim.

## III.  Conclusion

The court **GRANTS IN PART AND DENIES IN PART** the defendants' motion for summary judgment. Dkt. No. 30. The court **GRANTS** the defendants' motion as to the plaintiff's Fourteenth Amendment medical care claim. The court **DENIES** the defendants' motion as to the plaintiff's Fourth Amendment excessive force claim.

The court **ORDERS** that the parties must appear for a telephonic status conference on **September 13, 2022 at 11:00 AM** to discuss the next steps in the litigation. The defendants' counsel is to appear by calling the court's conference line at 888-557-8511 and entering access code 4893665#. The court has arranged with Oshkosh Correctional Institution for the plaintiff's appearance at the hearing.

Dated in Milwaukee, Wisconsin this 24th day of August, 2022.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**